IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

MARK SORENSEN

No. 19-cr-00745-1

Judge Franklin U. Valderrama

**MEMORANDUM OPINION AND ORDER**

A jury found Defendant Mark Sorensen (Sorensen) guilty of one count of conspiracy and three counts of offering and paying bribes or kickbacks in return for the referral of patients to SyMed, a durable medical equipment distributor owned by Sorensen. Sorensen now moves for a judgment of acquittal under Federal Rule of Criminal Procedure 29(c) or, in the alternative, for a new trial under Rule 33. R. 200, Def.'s Mot.[1] Additionally, after the Government rested at trial, Sorensen orally moved for judgment of acquittal under Rule 29(a), which the Court took under advisement pursuant to Rule 29(b). R. 187. Sorensen subsequently filed a written motion for judgment of acquittal. R. 196. For the reasons explained below, the Court denies Sorensen's Motions.

**Background**

Sorensen is the president and owner of SyMed, a durable medical equipment distributor that had a contract with Medicare. Tr. 461, 754, 766. At trial, the Government produced evidence that, in or around January 2015, Sorensen met with

---

[1]Citations to the docket are indicated by "R." followed by the docket number or filing name, and where necessary, a page or paragraph citation. The Court refers to the trial transcripts for the entire trial (R. 202–04, 206, 211, 216–17) collectively as "Tr."

Bernard Perconti (Perconti), Tim Size, and Dianne Chancellor, among several other people (all in-person), as well as Christie Anderson (Anderson) (via phone), during which they discussed establishing a business arrangement to advertise and sell medical braces, which would be billed to Medicare. Tr. 766–68. Perconti testified that the business model had multiple steps: (1) advertisements for braces, mostly online; (2) potential patients providing their contact information via the ads, which would be routed to a call center; (3) an intake sales call with an agent to discuss the potential patient's need for a brace; (4) creation of a long form lead if the potential patient wanted a brace; (5) the information collected would be input on a prescription document and faxed to the patient's physician (known as the chase process); (6) the doctor would sign (or not) the prescription and return it to Dynamic Medical Management (Dynamic Medical), owned by Stephanie Chancellor, and to SyMed for review; (7) Pakmed, the company owned by Perconti, would ship the brace to the patient, after which SyMed would bill Medicare. *Id.* 769–771, 810; *see also* GX Demonstrative 1; GX 2012; DX 6. Perconti testified that they began the steps in the aforementioned process in early 2015 and continued through early 2018. Tr. 788. Two companies, KP Network (KPN) owned by Craig O'Neil (O'Neil), and Byte Success, owned by Anderson, generated leads, meaning that they handled patient marketing and the provision of signed doctor's orders for the braces. Tr. 764, 776, 779, 807, 1051,

1057–62. Dynamic Medical provided third-party billing services for SyMed. Tr. 810–11.

In June 2015, SyMed and Pakmed entered into a billing services agreement, effective as of April 1, 2015. Tr. 795–96; GX 2030. The terms of the contract reflected that SyMed would pay Pakmed 79% of the collection from Medicare or other insurance, and SyMed would keep 21% as a service fee. *Id.* 790; GX 2030, GX 2033. KPN and Byte Success were also paid a percentage of the total amount collected by Medicare depending on the number of leads that they generated. Tr. 805–10, 1062–63. Dynamic Medical also received a percentage of the total. *Id.* 810–11.

In August 2016, Perconti and Sorensen met in Chicago, where Perconti told Sorensen that their existing arrangement was "not good" and they needed to make some changes. Tr. 838–39. Perconti provided Sorensen with a new draft contract, which included an hourly fee schedule.  Tr. 840–43; GX 2196. Sorensen suggested some edits to the second contract, and after those were incorporated, Sorensen signed the second contract on behalf of SyMed on August 24, 2016 and Perconti signed it on behalf of Pakmed in January 2017. Tr. 851–855; GX 2216, GX 2220. Although the contract provided for a new fee structure, that is, an hourly fee structure, in fact nothing changed and Pakmed and SyMed continued their 79/21 percentage fee structure. *Id.* 856–7; GX 2202, GX 2246, GX 2274.

In March 2017, Polina Goncharova (SyMed's Vice President of Finance and Operations and Sorensen's co-defendant) emailed Perconti, copying Sorensen, requesting invoices for the past 12 months of services from Pakmed to SyMed. Tr.

468–69, 861–71; GX 2246, GX 2251. Perconti created invoices based on a formula provided by Goncharova, which would equal the 79/21 breakdown for payment between Pakmed and SyMed. Tr. 858–75; GX 2246, GX 2246-1, GX 106, GX 107, GX 120. Perconti testified that Pakmed tapered off and eventually stopped selling leads to SyMed in 2018, despite pushback from Sorensen and Goncharova. Tr. 927–29, 985, 1062.

As part of the Government's investigation, Sorensen was interviewed by Special Agents Peter Theiler and Ed Leitel from the Department of Health and Human Services on July 31, 2019. Tr. 666; GX 320, GX 351.

On September 24, 2019, the Government charged Sorensen in a four-count indictment with one count of conspiracy and three counts of offering and paying bribes or kickbacks in return for the referral of patients to SyMed, a durable medical equipment distributor owned by Sorensen. R. 1, Indictment. Specifically, Count One of the indictment charged Sorensen and Goncharova (together, Defendants), beginning no later than in or around January 2015, and continuing through at least in or around April 2018, with conspiring to knowingly and willfully offer and pay any remuneration, including kickbacks and bribes, for the furnishing of services for which payment may be made in whole or in part under a federal health care program in violation of 42 U.S.C. § 1320a-7b(b)(2)(A) (the Anti-Kickback Statute). *Id.* Counts Two, Three, and Four charged Defendants with substantive violations of the Anti-Kickback Statute, that is, with knowingly and willfully causing SyMed to offer and pay remunerations in the amounts of $49,794, $300,000, and $56,767 on or about

November 20, 2015, April 6, 2017, and February 12, 2018, respectively, for the furnishing of services for which payment may be made in whole or in part under a federal health care program. *Id.*

Sorensen and Goncharova pled not guilty to all counts, and proceeded to a seven-day jury trial. R. 7, 18, 179–82, R. 187, R. 190–91. During the trial, the Government called the following witnesses: Stephen Quindoza, Jose Ruiz, David Kiesow, Carmen Gomez (Agent Gomez), Bernard Perconti, and Craig O'Neil. The Government did not call Christina Anderson or Agent Peter Theiler (Agent Theiler). Neither Sorensen nor Goncharova called any witnesses.

On January 19, 2023, the jury returned a verdict of guilty against Sorensen on all counts of the Indictment. R. 192. The jury returned a verdict of not guilty against Goncharova on all counts. R. 194. Sorensen now moves for a judgment of acquittal or a new trial on all counts, pursuant to Federal Rules of Criminal Procedure 29 and 33, respectively. Def.'s Mot.

## Legal Standards

### I. Rule 29

Under Rule 29(c), a defendant may move for a judgment of acquittal after a guilty verdict, and "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(2). Rule 29(a) further instructs that, "the court on the defendant's motion must enter a judgment of

acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).

A defendant seeking acquittal, however, faces "a nearly insurmountable hurdle." *United States v. Garcia*, 919 F.3d 489, 496 (7th Cir. 2019) (cleaned up).[2] The height of the hurdle "depends directly on the strength of the government's evidence." *United States v. Kelerchian*, 937 F.3d 895, 907 (7th Cir. 2019) (cleaned up). To prevail on a motion for acquittal, a defendant "must show that when viewing all the evidence in the light most favorable to the government, no rational jury could have found the essential elements of the offenses beyond a reasonable doubt." *United States v. Ghilarducci*, 480 F.3d 542, 546 (7th Cir. 2007) (cleaned up). In doing so, the court "draw[s] all reasonable inferences in" the government's favor." *United States v. Hidalgo-Sanchez*, 29 F.4th 915, 924 (7th Cir. 2022) (cleaned up). Accordingly, a court only overturns a conviction if, after reviewing the record in the light most favorable to the Government, it concludes "that no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Id.* (cleaned up). A verdict must stand if the record offers a reasonable basis for it. *Id.* (cleaned up). In addition, a court defers to the jury's deliberations and respects "the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences." *United States v. Godinez*, 7 F.4th 628, 638–39 (7th Cir. 2021) (cleaned up).

---

[2]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

If a court enters a judgment of acquittal after a guilty verdict, Rule 29(d) requires the court to "conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed." Fed. R. Crim. P. 29(d)(1).

## II.    Rule 33

Rule 33 permits a court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A new trial is warranted "only if there is a reasonable possibility that the trial error had a prejudicial effect on the jury's verdict." *United States v. Maclin*, 915 F.3d 440, 444 (7th Cir. 2019) (cleaned up). "[T]he crucial factor is the degree and pervasiveness of the prejudicial influence possibly resulting from the jury's exposure to the extraneous material." *Id.* (cleaned up).

## Analysis

Sorensen moves the Court to enter a judgment of acquittal pursuant to Rule 29, or in the alternative, for a new trial pursuant to Rule 33.[3] The Court considers Sorensen's acquittal arguments first, and then turns to his arguments for a new trial.

---

[3]It is worth noting that Sorensen's Motion and Reply refer generally to testimony and exhibits, but apart from listing the twenty-five exhibits which he contends were improperly admitted pursuant to Rule 804(d)(2)(E) in his Reply, Def.'s Reply at 10, Sorensen does not cite to any exhibits, rough transcripts, or official transcripts. The Court recognizes that Sorensen filed his Motion before the official transcripts were available, but, unlike the Government, Sorensen did not even cite to the available rough version of the transcripts. Accordingly, the Court was left to attempt to determine the evidence to which his briefs referred through its own review of the transcripts and exhibits.

7

## I. Motion for Judgment of Acquittal

Sorensen argues that he is entitled to a judgment of acquittal because the evidence at trial was insufficient to prove his requisite mental state beyond a reasonable doubt for all counts. Def.'s Mot. at 5–9. The Court starts with Count I, the conspiracy count.

### A. Count I (Conspiracy)

As stated above, the jury convicted Sorensen of, beginning no later than in or around January 2015 and continuing through at least in or around April 2018, conspiring to knowingly and willfully offer and pay any remuneration, including kickbacks and bribes, for the furnishing of services for which payment may be made in whole or in part under a federal health care program in violation of the Anti-Kickback Statute. Indictment at 6; R. 192.

A conviction under 18 U.S.C. § 371 for a conspiracy to violate the Anti-Kickback Statute requires that the Government proved beyond a reasonable doubt the following elements: (1) the conspiracy as charged in Count One existed; (2) the defendant knowingly and willfully became a member of the conspiracy with an intent to advance the conspiracy; and (3) one of the conspirators committed an overt act in an effort to advance a goal of the conspiracy on or before April 2018. *See United States v. George*, 171 F. Supp. 3d 810, 816 (N.D. Ill. 2016), *aff'd*, 900 F.3d 405 (7th Cir. 2018); 18 U.S.C. § 371; *see* R. 189, Jury Instr. at 31. As an initial matter, the Court must address the mental state required to sustain a conviction for conspiracy to violate the Anti-Kickback Statute.

### 1. Requisite *Mens Rea*

For the first time before this Court, the Government advances the cursory argument in its Response that "instructions on conspiracy do not require willfulness, namely that the defendant act voluntarily and purposefully, knowing that his or her conduct was unlawful and that he acted with a bad purpose to disobey or disregard the law." R. 205, Govt. Resp. at 2 n.2. Although the Government initially raised an objection to the inclusion of "willfully" in the jury instruction on the elements of Count One before the previously assigned judge,[4] R. 100 at 26, the Government did not include an objection to the instruction in the proposed jury instructions provided to the Court, R. 140 at 25. Nor did the Government raise an oral objection at any of the jury instruction conferences held before the Court before or during trial. Accordingly, with no objection raised by either party, the Court gave the instruction with the willfulness element. Jury Instr. at 31; Tr. 1361. The Court therefore finds it perplexing that the Government now backtracks to argue that "willfully" is not a required element of a conspiracy to violate the Anti-Kickback Statute. Govt. Resp. at 2 n.2. Besides being tardy and waived, *see United States v. DiSantis*, 565 F.3d 354, 361 (7th Cir. 2009), the argument also fails on the merits.

In support, the Government cites only to the Seventh Circuit Pattern Criminal Jury Instruction on conspiracies. Govt. Resp. at 2 (citing 7th Cir. Pattern Jury Inst. 5.08(A)). The Pattern Jury Instructions, however, are not binding on courts, although the Seventh Circuit has noted that they are a helpful starting point. *See Reyes v.*

---

[4]This case was reassigned to this Court on April 19, 2022. R. 126.

*United States*, 998 F.3d 753, 758 (7th Cir. 2021). Sorensen, on the other hand, points to numerous binding cases that hold that a conspiracy to commit a specific substantive offense against the United States cannot exist without at least the degree of criminal intent necessary for the substantive offense itself. R. 209, Def.'s Reply at 4 (citing *Ingram v. United States*, 360 US. 672, 678 (1959); *United States v. Feola*, 420 U.S. 671, 686 (1975); *Pettibone v. United States*, 148 U.S. 197 (1893); *United States v. Soy*, 454 F.3d 766, 768 (7th Cir. 2006)). Under the Anti-Kickback Statute, it is unlawful to knowingly *and willfully* offer and pay any remuneration, including kickbacks and bribes, for the furnishing of services for which payment may be made in whole or in part under a federal health care program. 42 U.S.C. § 1320a-7b(b)(2)(A). Although Sorensen does not cite any Seventh Circuit case directly on point, the Court agrees with him that that a conspiracy charged under 18 U.S.C. § 371 requires that a defendant willfully join a conspiracy with the intent to advance the purpose of the conspiracy, that is, to offer and pay remuneration in violation of the Anti-Kickback Statute. Def.'s Reply at 4–5.

What's more, courts in multiple other jurisdictions that have more directly addressed the question have found that a § 371 conspiracy to violate the Anti-Kickback Statute requires "(1) an agreement between two or more persons *to pursue an unlawful objective;* (2) the defendant's *knowledge of the unlawful objective* and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy. The Government must also prove that the defendant acted willfully, that is, with the

10

specific intent to do something the law forbids." *United States v. Hamilton*, 37 F.4th 246, 255–56 (5th Cir. 2022) (cleaned up) (emphases added); *see also United States v. Hills*, 27 F.4th 1155, 1185 (6th Cir. 2022) ("The health care kickback conspiracy required proof of an agreement to knowingly and willfully solicit, receive, offer, or pay kickbacks to [the defendant] in return for the referral of patients."); *United States v. Clough*, 978 F.3d 810, 817 (1st Cir. 2020) ("[G]overnment must not only prove defendant intended to agree, but that defendant willfully entered agreement with intent to violate underlying statute.") (cleaned up); *see also United States v. Valentino*, 2023 WL 361077, at *11 (E.D. Pa. Jan. 23, 2023) ("The conspiracy to violate the Anti-Kickback Statute charge requires the United States to demonstrate beyond a reasonable doubt that a conspiracy was formed with the purpose of violating the anti-kickback statute, that Defendant willfully and knowingly joined the conspiracy and, that one or more of the conspirators performed an overt act in furtherance of the conspiracy.") (cleaned up). Accordingly, the Court agrees with Sorensen that the Government was required to prove beyond a reasonable doubt that he knowingly and willfully became a member of the conspiracy with the intent to advance the purpose of the conspiracy.

### 2. Participation in Conspiracy

#### a. Sorensen's *Mens Rea*

Sorensen's primary argument is that the evidence presented at trial was insufficient for a rational trier of fact to find that Sorensen, or any of the other co-conspirators, knowingly and willfully joined a conspiracy in January 2015 to offer and

pay remuneration in violation of the Anti-Kickback Statute. Def.'s Mot. at 3, 5–6. He does not substantively attack the other elements of the conspiracy charge. According to Sorensen, the evidence demonstrated that Perconti was the first co-conspirator to discover, in February 2016, that the business arrangement between Perconti's company, Pakmed, and Sorensen's company, SyMed, was illegal. *Id.* at 3, 5–6. Sorensen contends that no rational trier of fact, absent mere speculation as to Sorensen's *mens rea*, could have found that Sorensen knowingly and willfully entered into an agreement to violate the Anti-Kickback Statute, in 2015 or at any time during the charged conspiracy. *Id.* at 3. In support, Sorensen points to Perconti's testimony that his attorneys informed him in February 2016 that the business arrangement with SyMed was illegal and that Perconti never told Sorensen that the deal was illegal. *Id.* at 5–6. Instead, Perconti told Sorensen that a new proposed contract he showed to Sorensen in August 2016 was "more compliant" than the first contract. *Id.* at 6. Sorensen also argues that his lack of knowledge about any illegality about the percentage-based payment structure was also demonstrated by the fact that he sought the advice of counsel as to the second contract. *Id.*; *see also* GX 2216; Tr. 851.

The Government retorts that the evidence proved that Sorensen knowingly joined the conspiracy and that it was reasonable for the jury to infer that he knew that the agreement to buy doctor's orders for braces and to charge Medicare was illegal from the beginning of the conspiracy in 2015. Govt. Resp. at 3–7. Specifically, the Government points to the recorded interview between Sorensen and Agent Theiler from July 2019, where Sorensen told Agent Theiler that he was aware of the

Anti-Kickback Statute and was "keenly aware" that it prohibits buying doctor's orders or prescriptions. GX 320.[5] He commented that "I've been around this a long time, as well . . . ." GX 320. At no time during the interview did Sorensen claim to have learned about the Anti-Kickback Statute, or its application only recently or around August 2016, when he and Perconti discussed a revised second contract. Additionally, during the interview, Sorensen lied to Agent Theiler about ever having paid a percentage per brace or for doctor's orders, and confirmed that he knew doing so was illegal. *Id.* Specifically, Sorensen answered Agent Theiler's questions:

> Q. Have you ever paid, like another, like marketing firm, like a certain percentage per brace?
> A. No.
> Q. Never done?
> A. No.
>
>      ***
>
> Q. Um, have you ever paid an entity or marketing firm, like, per brace? For like the order, for the signed order or anything like that?
> A. No.
>
>      ***
>
> Q. . . . You haven't paid a percentage for a brace to, like, a marketing firm or an entity. Um you haven't paid for doctors' orders or anything like that?
> A. Correct.
> Q. Um, because – and I say this to everybody, and I have to say – because you know if you did that, that's illegal.
> A. Correct, yes."
>
>      ***
>
> Q. So you've never, ever paid somebody for, like a, what we call completed leads?

---

[5]The Government cites to GX 220 in its Response, but the Court understands that to be a transcription error, as no exhibit titled GX 220 was introduced into evidence and the quoted testimony comes from GX 320.

A. Correct. Never done that.

GX 320.

The Government argues, and the Court agrees, that the Government produced evidence at trial that the agreement, at bottom, was for SyMed to pay Pakmed per brace for doctor's orders that were generated by KPN and Byte Success. Govt. Resp. at 4–5 (citing GX 2012); Tr. 791–93, 804–09. As described above, Sorensen participated in a meeting in 2015 to discuss the logistics of the agreement. *See* Tr. 766–68. Perconti testified that he began selling to SyMed the leads he received from Anderson in March 2015, and continued doing so through May 2018. Tr. 788. SyMed and Pakmed continued their percentage fee structure throughout that period. *Id.* 856–71. The evidence shows that Perconti proposed a new contract to Sorensen in August 2016, and that Perconti told Sorensen that his attorneys advised that the new contract was "more compliant." Tr. 958; GX 2220. Sorensen signed a new contract in January 2017, but it was backdated to August 24, 2016. GX 2220. The revised contract claimed compensation based on hours worked. *Id.* However, Perconti testified that Sorensen never tracked or asked Perconti for any calculations based on hours. Tr. 857. Even after the August 2016 meeting and after the second contract was signed in January 2017, SyMed continued paying Pakmed based on the 79/21 fee structure. *Id.* 857–75. The Government introduced evidence showing that, in March 2017, Sorensen and Goncharova asked Perconti to make up "invoices for the past 12 months of service from PAK to SyMed" that were "in line with our contract." GX 2246, GX 2251; Tr. 862–75. The request included instructions for how to create the false

invoices and asked Perconti to "change the % of Total Hours section. . . . I highly recommend doing so" to make sure not all of the invoices looked the same. *Id.* Although Goncharova sent the instructions to Perconti, Sorensen was copied on the emails and checked in on the status of the invoices to ensure they were being created. GX 2246, GX 2251. Sorensen focuses on Perconti's statement that he told Sorensen in August 2016 that the second contract was "more compliant," arguing that it shows that Perconti was concealing the fact that the first contract violated the Anti-Kickback Statute. Def.'s Mot. at 6; Def.'s Reply at 8–9. The Court agrees with the Government, however, that, in viewing the evidence in the light most favorable to the Government, Sorensen's active efforts to create false invoices after the execution of the second contract demonstrates that he knew the percentage-based payment structure was illegal. Govt. Resp. at 6.

The Government also argues that Sorensen's knowledge of the Anti-Kickback Statute and the conduct it prohibits is supported by his signature on Medicare enrollment applications for SyMed from 2006, 2016, and 2017, where he was required to acknowledge, among other things, that he "agree[d] to abide by the Social Security Act, and all applicable Medicare laws . . . [and] that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions, including but not limited to the Federal Anti-Kickback statute . . . ." Govt. Resp. at 3–4 (citing GX 2; Tr. 465–68). On its own, the fact that he signed those documents is insufficient to support a reasonable inference that Sorensen knew that paying for doctor's orders was illegal. However,

15

that evidence lends a modicum of support to the other evidence showing that Sorensen's knowledge that the agreement and payment structure was illegal. True, a chain of inferences unsupported by evidence cannot support a guilty verdict. Def.'s Mot. at 4 (citing *United States v. Jones*, 713 F.3d 336, 340 (7th Cir. 2013)). However, Sorensen's conduct throughout the life of the agreement, including his knowledge of the restructured SyMed-Pakmed contract in 2016 but the continued percentage fee structure and manufactured invoices, as well as his statements to Agent Theiler in 2019 that he has "been around this a long time" and is "keenly aware" that he cannot buy doctor's orders or pay by percentage fee structure, are sufficient to allow a rational trier of fact to make the reasonable inference that Sorensen knew from the beginning of the agreement in 2015 that the percentage fee structure and purchase of the doctor's orders violated the law. It may be a close call, but the Court may not act as a thirteenth juror. *See Arroyo v. Volvo Grp. N. Am., LLC*, 2019 WL 4749869, at *15 (N.D. Ill. Sept. 30, 2019) ("[T]he Seventh Circuit has cautioned that while the district court judge has a responsibility for the result [of the trial] no less than the jury, he should not set the verdict aside as against the weight of the evidence merely because, if he had acted as trier of the fact, he would have reached a different result; and in that sense he does not act as a 13th juror in approving or disapproving the verdict.") (cleaned up).

### b. Other Participants' *Mens Rea*

The question becomes then, when did another person involved in the scheme have the requisite knowledge that what they were doing was illegal. The Government

argues that it matters not whether Sorensen's co-conspirators also had the requisite mental state in January 2015, so long as an agreement existed. Govt. Resp. at 5 n.3 (citing *United States v. Bartlett*, 567 F.3d 901, 905 (7th Cir. 2009) ("An agreement forged in the course of committing a crime among people who plan to work together in an ongoing criminal venture, is no less a conspiracy than one that precedes the first overt act.")). The co-conspirators' *mens rea*, however, was not at issue in *Bartlett*. *See* 567 F.3d 901. Without citing any authority, Sorensen argues that a Section 371 conspiracy requires that at least two people entered into an agreement with the requisite mental state, which, in this case, the Court agrees with Sorensen is willfulness. Def.'s Reply at 7. In at least one case—cited by neither party—the Seventh Circuit has indicated that, so long as co-conspirators willfully joined a group, it matters not if the co-conspirators knew that group's acts were illegal as long as *someone* in the group knows. *United States v. Kehm*, 799 F.2d 354, 363 (7th Cir. 1986) (upholding sufficiency of jury instruction that the jury could find defendant guilty of conspiracy if it found that defendant "'knowingly and intentionally' signed up with the team" even where defendant argued that he did not join the "smuggling ring and acted only as a lawyer, unaware of the nature of the gang whose corporation he oversaw," where "there was no dispute at trial that *someone* in the . . . organization intended to import drugs") (emphasis in original).

The Court need not definitively determine whether more than one party to an agreement must have the requisite *mens rea* to be convicted of a conspiracy in order for a conspiracy to be formed, because the Court agrees with the Government that

the evidence, viewed in the light most favorable to the Government, would allow a rational trier of fact to determine that Perconti or O'Neil knew their conduct was illegal in or about July 2015 and engaged in the conduct anyways, and the difference between January 2015 and July 2015 was not prejudicial to Sorensen. Govt. Resp. at 7–15.

Sorensen contends that no participants knew that the agreement violated the Anti-Kickback Statute until February 2016,[6] when Perconti's attorneys informed him that Pakmed's arrangement with SyMed was illegal. Def.'s Mot. at 5–6; Tr. 833, 931–32. The Government, on the other hand, argues that the evidence shows that the evidence supports a conspiracy "absolutely no later than June 2015." Govt. Resp. at 13–14. The Court mostly agrees with the Government, although it finds that the evidence supports another participants' knowledge that the payment structure violated the Anti-Kickback Statute in July 2015, rather than June 2015. The Government points to evidence that Perconti testified that he "started having suspicions about [its legality] in 2015 and then when [he] consulted [his attorney] . . . it was clear." Govt. Resp. at 10 (quoting Tr. 931). A closer look at the testimony shows that Perconti stated that he began having suspicions based on "chatter of people" in the industry about percentage relationships" sometime in 2015 before he spoke to his attorneys in January 2016, at which time he clearly understood the arrangement was illegal. Tr. 932. The Government does not point to, and the Court cannot find any,

---

[6]Perconti testified that he "was clear" that paying a percentage was illegal when he consulted his attorneys in January 2016, Tr. 931–32, but the month matters not, given the Court finds that, viewing the evidence in the light most favorable to the Government, O'Neil joined the conspiracy with the requisite mental state in July 2015.

testimony from Perconti that he stated he began having suspicions about the arrangement as early as June 2015.

On the other hand, the Court agrees with the Government that the record, when viewing the evidence in the light most favorable to the Government, supports a conclusion that O'Neil suspected that the arrangement was illegal in July 2015 and intentionally avoided learning more. Govt. Resp. at 11. Specifically, as the Government points out, O'Neil testified that he began working with SyMed and Perconti in July 2015, and that after he learned about the payment structure during a July 2015 call with Perconti, he believed the payment arrangement was "highly unusual" and had some concerns about it. Tr. 1058, 1066–68, 1074–76. He asked Perconti whether the arrangement was "checked out," to which Perconti assured him that lawyers "thought it was okay." *Id.* 1075. O'Neil testified that he did not hire his own attorney to address his concerns because he "liked the answer," specifying that "[i]t made the problem [he] was working on easier, so . . . [he] didn't dig into it further." *Id.* 1076. Sorensen points out that O'Neil testified that he told federal agents during an interview on August 27, 2019 that he "had only recently learned that the agreement was not okay" and that O'Neil believed in 2015 that Pakmed was not subject to the Anti-Kickback Statute. Def.'s Reply at 5–6. True, during cross-examination, O'Neil acknowledged making a similar statement to federal agents in 2019. Tr. 1164–68. However, contrary to Sorensen's position that there was "no evidence that any of the alleged co-conspirators were aware that their conduct may be unlawful," Def.'s Reply at 6, there was conflicting evidence presented to the jury

about when O'Neil knew or suspected and avoided learning the truth about the illegality of the agreement, *compare* Tr. 1058, 1066–68, 1074–76 *with* Tr. 1164–68. Therefore, viewing the evidence in the light most favorable to the Government, as the Court must, the Court finds that O'Neil's testimony supports a finding that he had a subjective belief that the percentage-fee arrangement was illegal and he took deliberate action to avoid learning of that fact as of July 2015. That is sufficient to find intent under a willful blindness theory. *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011) ("[A] willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts."). So, the Court evaluates Sorensen's variance argument based on the conspiracy starting in July 2015.

### c. Variance

Sorensen contends that his conviction must be reversed because the evidence supporting the date the conspiracy formed differs from the date in the indictment, and the difference was material and prejudicial. Def.'s Mot. at 5–7.

The Fifth Amendment provides in part that, "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury . . . ." U.S. Const. amend V. The United States Supreme Court has "explained 'that a court cannot permit a defendant to be tried on charges that are not made in the indictment against him.'" *United States v. Heon Seok Lee*, 937 F.3d 797, 805–06 (7th Cir. 2019) (quoting *Stirone v. United States*, 361 U.S. 212, 217 (1960)). The Seventh Circuit has observed that "[t]wo related doctrines arise out

of this Fifth Amendment requirement: constructive amendment and variance." *Id.* "A constructive amendment of an indictment occurs if jury instructions support a conviction for a crime other than that charged." *United States v. Burge*, 711 F.3d 803, 811 (7th Cir. 2013) (cleaned up). On the other hand, a variance "does not alter the essential substance of the charged offense." *Id.* (cleaned up). "In general, a variance will not constitute reversible error unless it change[s] an essential or material element of the charge so as to cause prejudice to the defendant." *United States v. Scheuneman*, 712 F.3d 372, 379 (7th Cir. 2013) (cleaned up). A conspiracy variance claim is treated as an attack on the sufficiency of the evidence. *United States v. Hopper*, 934 F.3d 740, 758 (7th Cir. 2019).

As an initial matter, the Court rejects the Government's argument, raised in a footnote, that no variance existed because conspiracy dates are not an element of a conspiracy charge at all. Govt. Resp. at 8 n.5. The Government only cites a an out of District case in support of this proposition. *Id.* (citing *Gary v. United States*, 2013 WL 1288060, at *8 (E.D. Wis. March 27, 2013)). However, the court in *Gary* rejected the defendant's argument that his conspiracy conviction must be overturned because the evidence did not show that he and his co-conspirator conspired specifically on the dates included in the indictment; the court found that the indictment included bookend dates, and that the "range of dates comprised an element necessary to prove the offense," but that the defendant could not "attempt to focus upon outlier, individual dates to challenge his conviction." 2013 WL 1288060, at *8. Here, Sorensen, unlike the defendant in *Gary*, argues that a material variance exists

because no conspiracy existed for a portion of the *range* of dates charged in the indictment; he does not attack the specific dates charged in the indictment. *See* Def.'s Mot. at 6–8.

Still, as the Government points out, the Seventh Circuit—as well as other circuit courts—have often stated that time or date is not a "material element" of a conspiracy charge. Govt. Resp. at 8–9 & n.5 (citing, among other cases, *United States v. Simmons*, 142 F.3d 441, at *1 (7th Cir. 1998) ("Here the date on which the conspiracy began does not establish the very existence of the charged offense. Accordingly, the date is not a material element."); *United States v. Cina*, 699 F.2d 853, 859 (7th Cir. 1983) ("Only in rare cases is time a material element of the offense charged, even where continuing offenses such as conspiracy are alleged."); *United States v. Richeson*, 825 F.2d 17, 21 (4th Cir. 1987); *United States v. Warshak*, 631 F.3d 266, 309 (6th Cir. 2010) (finding that "the government was under no obligation to prove that the conspiracy spanned the entirety of [the] time frame" alleged in the indictment, as "the evidence was sufficient so long as the government proved a conspiracy within the relevant chronological bounds")). So, the Court agrees with the Government that, on its own, the variance between the date range charged in the indictment (January 2015 through April 2018), and that proved at trial (July 2015 through April 2018) is not material such that the verdict must be overturned. *See Cina*, 699 F.2d at 859; *Simmons*, 142 F.3d 441, at *1.

Sorensen argues that the variance was material here, however, because he was prejudiced by it for two reasons: (1) the variance allowed the Government to admit

otherwise inadmissible co-conspirator statements pursuant to Federal Rule of Evidence 801(d)(2)(E); and (2) the variance subjects Sorensen to a more severe punishment because the loss amounts are higher. Def.'s Mot. at 6–7; Def.'s Reply at 9–11. The Court addresses each argument in turn.

Starting with the co-conspirator statements, the Government argues that, even if the Court agrees with Sorensen that any evidence was improperly admitted under Rule 801(d)(2)(E), only five emails are implicated between January 2015 through June 2015: GX 2009, GX 2012, GX 2016, GX 2021, and GX 2028. Govt. Resp. at 13–14. On the other hand, Sorensen, in Reply, contends that twenty-give emails were improperly admitted. Def.'s Reply at 10. As indicated above, the Court finds that the evidence supports that O'Neil was the first co-conspirator (other than Sorensen) to have the requisite intent in July 2015—rather than June 2015, as argued by the Government—which implicates an additional three emails that were included in Sorensen's Reply but not in the Government's Response: GX 2030, GX 2032, and GX 2033.[7] The Court agrees with the Government that, both on their own and together,

---

[7]To convict a defendant of any charge at trial, of course the Government must prove each element beyond a reasonable doubt. *See Ghilarducci*, 480 F.3d at 546. However, in order to properly invoke the co-conspirator statement exception under Rule 801(d)(2)(E), the Government need only to have proved by a preponderance of the evidence that a conspiracy existed and the at-issue statements were made in furtherance of the conspiracy. *See United States v. Prieto*, 549 F.3d 513, 523–24 (7th Cir. 2008). Neither party addresses the difference in standards of proof. No matter, because the Court finds that, at the very least, the Government proved the existence of a conspiracy by a preponderance of the evidence by July 2015 such that any emails from that period were properly admitted under Rule 801(d)(2)(E). And, as discussed above, the Court finds that the admission of the eight emails with which Sorensen takes issue during that period did not prejudice Sorensen.

the admission of these emails did not create the kind of prejudice such that the variance is considered material.

Starting with GX 2009, the exhibit consists of an email chain in which Diane Chancellor gives Sorensen's cell phone number to Perconti in order to contact Sorensen about the program. As the Government points out, Sorensen's counsel quoted this email in his opening statement, highlighting that Diane Chancellor calls Sorensen "compliant" in the email. Govt. Resp. at 14 (citing Tr. 399). Perconti also testified, separately from any testimony relating to GX 2009, that Diane Chancellor introduced Sorensen and Perconti in regard to pursuing a business relationship. Tr. 757. Accordingly, the Court finds that the admission of GX 2009 was not prejudicial. Next, GX 2012 is an email in which Perconti shares with Sorensen and several others an attached write up of the "process flow" for brace prescriptions that the group followed. The email itself is simply for context but is not a statement admitted for the truth. And the defense introduced a version of the attached document during Perconti's cross-examination. DX 6; Tr. 977–81. Moreover, Perconti testified about those steps, which the Government recorded in Government Demonstrative 1. Tr. 768–71. GX 2016 is an email chain that includes Sorensen's own statements, which are admissible under Rule 801(d)(2)(A). There are three additional emails between Perconti and Anderson, and the Court agrees with the Government that these remaining statements were not offered for the truth (e.g., that Anderson actually used a particular phone number on the prescription forms reflecting SyMed's logo). Although Anderson's statement "I will set up a local number that goes to my chase

24

team so it looks legitimate" implies that Anderson and/or Perconti knew they were doing something illegitimate, this is not prejudicial to Sorensen because he was not copied on the email.[8]

GX 2021 consists of an email from Anderson to Perconti with the first signed prescription created by Anderson and sent to Perconti to review. The signed prescription is not a "statement," and the emails including Anderson and Perconti are not offered for the truth but rather show that Anderson had the process for the doctor's orders ready to go, which Perconti also testified about. *See* Tr. 772–73. Next, GX 2028 shows O'Neil and Perconti's initial discussion of doing business with SyMed. Similarly, GX 2028 was not introduced for the truth, but rather just to show the timeframe of their discussions, corroborating their testimony. *See* Tr. 886, 1056–58.

The Court next addresses the three emails sent in June 2015, which were not addressed in the Government's Response. GX 2030 is an email from Goncharova to Perconti and Sorensen attaching a billing services agreement for signature. Because Goncharova was Sorensen's co-defendant at trial, her own statements were

---

[8]Viewing the evidence in the light most favorable to the Government, this email could support a finding that the Government proved by a preponderance of the evidence (as required for admission of co-conspirator statements under Rule 804(d)(2)(E)) that at least one of Sorensen's co-conspirators had the requisite *mens rea* at this time, March 9, 2015. The Government did not point to this email in its Response as showing that Perconti knew that the agreement was illegal, instead citing to his testimony that he suspected or understood that his conduct was illegal "at various points in 2015," and specifically citing his testimony that "his concerns were elevated as the payment amounts increased throughout 2015, causing him to reach out to attorneys in early 2016." Govt. Resp. at 13 (citing Tr. 931–32). And the Government did not address Anderson's intent at all in its Response. Accordingly, for the sake of completeness, the Court addresses the additional exhibits dated between March 9, 2015 and July 2015 that were admitted pursuant to the Government's *Santiago* proffer.

admissible against her at trial under Rule 801(d)(2)(A). *See United States v. Guzman-Cordoba*, 988 F.3d 391, 405–06 (7th Cir. 2021), *reh'g denied* (Mar. 8, 2021). The Court gave a limiting instruction to the jury, whereby it instructed them that they "may not consider the statement of one defendant as evidence against the other defendant." Jury Instr. at 13. Such an instruction properly mitigated any risk that the jury would improperly use Goncharova's statements against Sorensen. *Guzman-Cordoba*, 988 F.3d at 406. Moreover, Perconti testified about receiving the billing services agreement in June 2015, that the agreement had signature lines for himself and for Sorensen, and that the terms of the agreement included a 21 percent service fee. Tr. 795–98. GX 2032 consists of emails from Perconti and O'Neil to a group including Sorensen, Stephanie Chancellor, and Diane Chancellor, regarding the launch of the program. Perconti and O'Neil also testified about the timing and logistics of the launch of the program. *See* Tr. 886, 1061–1063. Finally, GX 2033 is an email chain between Goncharova and Perconti, including the signed billing services agreement as an attachment. As stated above, Goncharova's statements were separately admissible under Rule 801(d)(2)(A). Perconti's emails contain only one statement that could be considered to be offered for the truth of the matter asserted: "I crossed out DVT as we only do orthotics." GX 2033 at 2. The Government did not ask Perconti about this statement, nor did it highlight it during the trial. Moreover, Perconti testified generally that his handwriting was on the billing services agreement, but did not testify about the change that he made. Tr. 799–800. He testified that he signed the billing services agreement, which was the crux of the email exchange. *Id.*

Sorensen argues generally that the admission of these emails prejudiced him because the Government used them "to tell a story to the jury and prove its theory of guilt." Def.'s Reply at 11. He posits, without support, that if the evidence "was not prejudicial then it was not relevant." *Id.* The Court disagrees. First, as discussed above, a number of the exhibits were admissible at trial under hearsay exceptions or exemptions other than Rule 801(d)(2)(E). And even though several exhibits included hearsay statements admissible pursuant to the *Santiago* proffer only, the Court agrees with the Government that, assuming that the proven conspiracy started in July 2015 rather than January 2015, the impact of those emails cannot be said to have affected the jury's verdict such that the variance was material and prejudicial. Govt. Resp. at 14–15 (citing *United States v. Eads*, 729 F.3d 769, 778 (7th Cir. 2013) ("[T]he test for harmless error is whether, in the mind of the average juror, the prosecution's case would have been significantly less persuasive had the improper evidence been excluded.") (cleaned up)). As discussed above, the Government produced other evidence apart from the arguably improperly admitted exhibits, primarily in the form of Perconti and/or O'Neil's testimony, setting forth substantially similar information. In the face of little specific argument and no authority from Sorensen, the Court finds that admission of these exhibits was harmless, and certainly does not constitute "the sort of prejudice that forbids a variance between the evidence presented at trial and the details of the indictment." *Simmons*, 142 F.3d 441, at *2; *Cina*, 699 F.2d at 857.

The Court now turns to Sorensen's argument that the variance subjects Sorensen to a more severe punishment because the loss amounts are higher. Def.'s Mot. at 7. In Response, the Government contends that this argument is unripe, as no sentencing guidelines have yet been determined. Govt. Resp. at 12. Sorensen does not respond to the Government's ripeness argument in Reply, and has thus waived any response. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."). As the Government points out in Response, the only case cited by Sorensen in his Motion, *United States v. Stigler*, 413 F.3d 588 (2005), found that the defendant was prejudiced by a variance based on the number of members proven to be part of the conspiracy, which resulted in a two-point enhancement at sentencing.

The Court agrees with the Government that, because sentencing in this case has not yet occurred and therefore the Court has not yet determined the Guidelines range, Sorensen's argument that he will be subjected to more severe punishment based on the loss amount between January 2015 and July 2015 being attributed to him is not ripe.[9] Sorensen is free to argue the issue at sentencing.

---

[9]Even if the issue were ripe, without prejudging the sentencing Guidelines, the Court finds the Government's calculations appear to be correct. That is, the Government produced evidence at trial showing that Medicare paid SyMed approximately $23.6 million between January 2015 and April 2018. Govt. Resp. at 12–13 n.7 (citing Tr. 435; GX 1). It is worth noting that the Government's Response states that amount was proved between January 2015 and *July* 2018, which is not the end date of the charged conspiracy. *Id.* The cited evidence refers to *April* 2018, however, which is the correct charged end date. Tr. 434–35; GX 1. This amount, $23.6 million, corresponds to Guideline § 2B1.1(b)(1)(K) (more than $9.5 but less than $25 million), which adds 20 levels. As the Government points out, it introduced evidence showing that, even if the loss eliminated all of 2015, it would only reduce the amount paid to SyMed from Medicare by $3.4 million, for a total of $23.2 million. *Id.* (citing GX 1).

Accordingly, even assuming that a variance existed, such that the Government proved that a conspiracy formed in July 2015 rather than January 2015, the Court finds that such a variance was not material or prejudicial. The Court next addresses the three substantive counts for violation of the Anti-Kickback Statute.

## B. Violations of the Anti-Kickback Statute (Counts II–IV)

Sorensen also moves for a judgment of acquittal on Counts Two, Three, and Four. Def.'s Mot. at 7–9. As stated above, the jury convicted Sorensen of substantively violating the Anti-Kickback Statute, that is, of knowingly and willfully causing SyMed to offer and pay remunerations in the amounts of $49,794, $300,000, and $56,767 on or about November 20, 2015, April 6, 2017, and February 12, 2018, respectively, for the furnishing of services for which payment may be made in whole or in part under a federal health care program. *See* Indictment; R. 192. Sorensen attacks only the willfulness element, arguing that the evidence at trial demonstrated that Sorensen did not know that the business arrangement was illegal at any time between January 2015 and April 2018. Def.'s Mot. at 7–9. For the reasons discussed in detail above, *see supra* Section I.A.2.a, the Court finds that the evidence at trial was sufficient to allow a rational trier of fact to make the reasonable inference that Sorensen knew from the beginning of the agreement in 2015 that the percentage fee

---

This leaves Sorensen in the same loss band of between $9.5 and less than $25 million. Accordingly, unlike the defendant in *Steiger*, Sorensen would not be subject to a higher sentencing Guidelines range based on the variance. Of course, as stated above, Sorensen remains free to argue for a different Guidelines range at sentencing; the Court is not making a determination of the range at this stage and without the benefit of the parties' sentencing memoranda or oral arguments.

structure and purchase of the doctor's orders violated the law and that he nonetheless caused SyMed to offer and pay remunerations as charged.

Accordingly, all in all, taken together, and viewed in the light most favorable to the Government, the trial evidence was enough for a rational jury to find Sorensen guilty of one count of conspiracy and three counts of offering and paying bribes or kickbacks in return for the referral of patients to SyMed. True, the evidence is far from overwhelming; however, as stated above, the Seventh Circuit has cautioned that the District Court should not act as a thirteenth juror. *See Arroyo*, 2019 WL 4749869, at \*15; *see also Latino v. Kaizer*, 58 F.3d 310, 315 (7th Cir. 1995). So, no matter how this Court may have found at trial, that is not the standard it must now apply. Sorensen's motion for judgment of acquittal pursuant to Rule 29 is denied.

The Court now turns to Sorensen's motion for a new trial under Rule 33.

## II. Motion for a New Trial

In the alternative, Sorensen moves for a new trial, taking issue with several of the Court's pre-trial rulings and rulings at trial. Def.'s Mot. at 9–13. The Government's Response addressed each of Sorensen's arguments. Govt. Resp. at 16–23. Sorensen did not address any of the Government's arguments in Reply. *See* Def.'s Reply. The Court addresses each alleged error in turn.

### A. Agent Testimony

First, Sorensen argues that the Court erred by allowing Agent Gomez to testify as to matters of which she had no personal knowledge; namely, the recording of Agent Theiler's interview with Sorensen. Def.'s Mot. at 9. Sorensen contends that the

recoding was admitted without foundation, and that it contained inadmissible hearsay. *Id.* The Government responds that sufficient foundation was laid because Agent Gomez testified that she was part of the team of agents investigating Sorensen and SyMed for at least five years and she was involved in the case in her capacity as a Department of Labor agent, in conjunction with a number of other agencies, such as the Department of Health and Human Services (the agency for which Agent Theiler works). Govt. Resp. at 16; Tr. 643–44, 666. Agent Gomez testified that she had reviewed the audio and video recordings of the interview of Sorensen. Tr. 664–65. She also testified that she knew the interviewee was Sorensen because she recognized him from prior interactions and because he identified himself in the recording. *Id.* 665.

As the Government states in its Response, defense counsel opposed the Government's motion *in limine* to introduce the recordings via an agent other than the interviewing agent, but the previously assigned judge granted the Government's motion, relying on the case cited in the Government's motion and reasoning that the Government is entitled to choose its own witnesses. R. 103, 11/18/2021 Tr. 48–50 (citing *United States v. Cruz-Rea*, 626 F.3d 929, 934 (7th Cir. 2010)). The previously assigned judge also ordered the Government to make the interviewing agent, Agent Theiler, available during trial. *Id.* 50. Sorensen listed Agent Theiler on his witness list, R. 139, and Agent Theiler was in the courtroom during trial and available to be called as a witness, *see* Tr. 670–71; Def.'s Mot. at 9. At trial, Sorensen's counsel re-raised its objection to the introduction of the recording through Agent Gomez rather

31

than Agent Theiler, and this Court declined to revisit the previous judge's ruling. Tr. 671–72.

In his motion for a new trial, Sorensen does not cite to any specific hearsay statements in the recording with which he takes issue, and he cites to no authority supporting his position that allowing the Government to introduce the recording via Agent Gomez rather than Agent Theiler was prejudicial error. *See* Def.'s Mot. at 9. Indeed, he cites only to a case from this District—where another judge criticized Agent Theiler's investigatory techniques—in order to speculate as to why the Government did not call Agent Theiler. *Id.* (citing *United States v. Novak*, 2015 WL 720970, at *30, 34–36 (N.D. Ill. Feb. 18, 2015)). The court's statements in *Novak* have no bearing on whether it was permissible for the Government to introduce the recording via Agent Gomez.

The Court finds that Agent Gomez laid sufficient foundation for admission of the recording, given her familiarity with the investigation into SyMed and Sorensen, her familiarity with Agent Theiler, and her review of the recordings prior to trial. As to any hearsay, the Court understands that Sorensen takes issue only with Agent Theiler's statements, as Sorensen's own statements are admissible under Federal Rule of Evidence 801(d)(2)(A). *See* Tr. 670–71. However, Agent Theiler's statements were not offered for the truth of the matter asserted; in fact, Agent Gomez testified that the interview was a "ruse interview," meaning the purpose of the interview is not disclosed to the person being interviewed. Tr. 666–67. Moreover, as stated above, to the extent that Sorensen wanted to cross-examine Agent Theiler about the

recording, Agent Theiler was available to be called as a witness. The Court finds that there was no prejudicial error in allowing the recording to be introduced via Agent Gomez.

### B. Good Faith Jury Instruction

Next, Sorensen contends that it was error for the Court to decline to give Sorensen's proposed "good faith" jury instruction. Def.'s Mot. at 9–10. Sorensen argues that the evidence at trial revealed that multiple cooperating witnesses believed that the agreement was lawful for at least a period of the alleged conspiracy, and that even when Perconti learned that it was unlawful, he never informed Sorensen, instead telling Sorensen that an updated contract was "more compliant." *Id.* at 10. He therefore posits that the Court should have given his proposed good faith instruction, which communicated to the jury that he could still be acting in good faith, even if his understanding of the law was incorrect. *Id.* (citing Seventh Cir. Pattern Jury Inst. 6.10 (acknowledging that a good faith instruction can be appropriate where the Government must prove some form of specific intent, such as willfulness)).

As the Government argues in Response, the parties thoroughly briefed the issue before trial and argued the issue before the Court during the final jury instruction conference. Govt. Resp. at 17–18. The Court considered the parties' arguments and authority, and conducted its own research. Tr. 1307–18. As the Court stated during the jury instruction conference and in its Minute Order ruling on the instruction, "the good faith requirement is essentially baked into the willfulness instruction." *Id.* 1310; R. 188 (citing *United States v. Kokenis*, 662 F.3d 919, 930 (7th

Cir. 2011); *United States v. Thompson*, 761 F. App'x 283, 292 (5th Cir. 2019) ("This court has upheld a district court's refusal to include a 'good faith' instruction to the jury where the defense is substantially covered by the charge given and the defendant has had the opportunity to argue good faith to the jury.") (cleaned up)); *see also United States v. Chanu*, 40 F.4th 528, 543 (7th Cir. 2022) (defendants failed to demonstrate failure to give good faith jury instruction denied them fair trial when same concept was covered in other instructions). Sorensen's motion for a new trial has not raised a basis supporting a new trial based on the Court's refusal to give Sorensen's proffered good faith instruction.

### C. Mistrial Based on Co-Conspirator Statement

Without identifying the witnesses or specific testimony, Sorensen contends that testimony from the Government's cooperating witnesses that they did not know their conduct was illegal from January 2015 through at least August 2016 warranted a mistrial. Def.'s Mot. at 10. As discussed above, the evidence shows that O'Neil knew that his conduct was illegal in at least July 2015. *See supra* Section I.A.2.b. Moreover, as discussed in detail above, the Court finds that any variance was not material and any prejudice stemming from it was minimal. *See supra* Section I.A.2.c; *see also United States v. Cruse*, 805 F.3d 795, 804, 813 (7th Cir. 2015) (variance calls a jury verdict into question only "if it prejudiced the defendant, such as by depriving him of fair notice of the charges against him or by creating the risk of double jeopardy"). Accordingly, a new trial is not warranted on this basis.

### D. Quindoza's Testimony

Sorensen also argues that the Court erred by allowing the Government's expert witness, Quindoza, to testify in the form of hypotheticals as to Sorensen's mental state in violation of Federal Rule of Evidence 704(b). Def.'s Mot. at 10–11. Specifically, Sorensen argues that the Court allowed Quindoza to opine as to whether, under a certain set of circumstances, certain actions would be a violation of the Anti-Kickback Statute, and Sorensen contends such opinion presumes that the hypothetical individual had the requisite willful intent. *Id.* at 11.

As the Government correctly points out in Response, the Government only asked three hypotheticals of Quindoza, and the Court sustained Sorensen's counsel's objections to two of them, including the only hypothetical in which Quindoza actually referenced the Anti-Kickback Statute. Govt. Resp. at 19. Specifically, the three hypotheticals were: (1) "Q. If someone was paying a percentage of what Medicare was paying for the claim, could that be considered a kickback? A. Yes." Tr. 445. (2) Q. Mr. Quindoza, based on your . . . 40 plus years, of dealing with Medicare claims and the rules and regulations of Medicare, if hypothetically someone was paying someone else per signed doctors order, could that be considered a referral? . . . A. It would be considered a violation of the Anti-Kickback Statute." *Id.* 489. (3) "Q. And if someone, based on your experience, hypothetically, if someone was paying someone for doctors' orders, could that be considered a referral? . . . A. Yes." *Id.* 491.

Sorensen objected to the first hypothetical, which the Court sustained, although Sorensen did not ask the Court to strike the answer, and therefore the Court

did not specifically advise the jury that such testimony was stricken. Tr. 445–46. On the other hand, the Court sustained Sorensen's objection to Quindoza's answer to the second question and told the jury "[t]hat will be stricken. The jury will disregard the answer." *Id.* 489. The Court overruled Sorensen's objection to the third question.

As to the first and third questions and answers, the Court agrees with the Government that these were opinions based on Quindoza's expertise and experience. Govt. Resp. at 19. As the Government states in its Response, "[e]xperts are permitted to testify regarding how their government agency applies rules as long as the testimony does not incorrectly state the law or opine on certain ultimate legal issues in the case." *Id.* (quoting *United States v. Davis*, 471 F.3d 783, 789 (7th Cir. 2006) (permitting Medicaid expert to testify about the law, how it is enforced, interpreted, and distributed to people required to follow it)). The first question, as to whether paying a percentage of what Medicare paid for a claim is considered a kickback, is similar to what the Seventh Circuit held to be permissible expert testimony in *United States v. Owens*, 301 F.3d 521, 524, 526–27 (7th Cir. 2002), which was cited in *Davis*, 471 F.3d at 789. In *Owens*, the Government's expert testified that the appraisal reports prepared by the defendant—and which were the subject of the criminal charge against him—did not comply with regulations and appeared to be fraudulent. 301 F.3d 521, 524, 526–27. The court reasoned that because the expert never directly commented on the defendant's state of mind, the testimony that the defendant's appraisal reports were "misleading and fraudulent" did not violate Rule 704(b). *Id.*

The Government's third hypothetical question and Quindoza's answer regarding what constitutes a referral are also permissible under *Owens*.

As to Quindoza's answer to the second question, as stated above, the Court immediately sustained Sorensen's objection, struck the testimony, and told the jury to disregard the answer. Tr. 489. The Seventh Circuit has stated "that jurors are presumed to follow limiting and curative instructions unless the matter improperly before them is so powerfully incriminating that they cannot reasonably be expected to put it out of their minds." *United States v. Danford*, 435 F.3d 682, 687 (7th Cir. 2006) (cleaned up). It has also held that, generally, "a mistrial is appropriate when an event during trial has a real likelihood of preventing a jury from evaluating the evidence fairly and accurately, so that the defendant has been deprived of a fair trial." *United States v. Tanner*, 628 F.3d 890, 898 (7th Cir. 2010) (cleaned up). Given that Sorensen immediately objected to the testimony, and the Court struck the answer and told the jury to disregard it, after which the Government moved on, the Court finds any potential for unfair prejudice to be obviated. *See Danford*, 435 F.3d at 686–87; *see also United States v. Roman*, 2006 WL 2631967, at *3 (N.D. Ill. Sept. 7, 2006), *aff'd,* 492 F.3d 803 (7th Cir. 2007). Accordingly, the Court finds that the three questions and answers did not prejudice Sorensen such that a new trial is warranted.

### E. Government Exhibit 305

According to Sorensen, the Court erred in denying Sorensen's motion to strike GX 305 for lack of foundation and relevance. Def.'s Mot. at 11–12. GX 305 was admitted during Agent Gomez's testimony, and is a voicemail recording dated May 4,

2018 in which Sorensen speaks. GX 305; Tr. 678–79. In the recording, Sorensen left a message for Anderson, saying "[w]e do some work with you, um, and Bernie Perconti and his team," and asking Anderson to call him back, as he has a few "quick questions" for her. GX 305.

Sorensen posits that he did not object to the introduction of this exhibit at trial, because he—and the Court—were under the impression that Anderson would be testifying at trial. Def.'s Mot. at 11. That is true. However, for similar reasons as discussed above, in relation to the recording of Sorensen and Agent Theiler, the Court agrees that the Government laid sufficient foundation for the introduction of the voicemail recording during Agent Gomez's testimony. *See supra* Section II.A. As noted above, Agent Gomez testified that, in her capacity as a Department of Labor agent, she was part of the team of agents investigating Sorensen and SyMed for at least five years. Tr. 643–44. As to the specific recording, Agent Gomez testified that she had reviewed the recording before trial, and she is able to identify Sorensen as the speaker because "[h]e identifies himself." *Id.* 679. And, as Sorensen is the only speaker, his testimony is admissible pursuant to Rule 801(d)(2)(A); there are no hearsay issues relating to Anderson's own statements because she did not make any on the recording. Moreover, similar to Agent Theiler, Anderson was in the building during trial and available to be called as a witness by Sorensen. Tr. 1251–52. Sorensen included on his witness list "anyone listed on the government's witness list," R. 139, and Anderson was included on the Government's list, R. 137.

As to the relevance, the Court understands Sorensen's motion to be premised on the same argument raised in his response to the Government's motion *in limine* E, R. 94, R. 99, that the recording is of a call made after the end of the charged conspiracy. Def.'s Mot. at 11. The previously assigned judge ruled that certain post-conspiracy statements were admissible, R. 106, acknowledging during a hearing that they are admissible to show Sorensen's knowledge of the actual charged conspiracy, 11/18/2021 Tr. 45–46. The Court agrees with the Government that whether or not Anderson testified at trial has no bearing on the recording's relevance. Govt. Resp. at 21.

Even assuming that there was improper foundation or no relevance to the recording, the Court finds that the recording, which, as stated above, is short and contains little substance, therefore was nowhere near the level of prejudicial that would deprive Sorensen of a fair trial and warrant a new trial.

### F. Rule 404(b)(2) Evidence of Perconti

Sorensen claims that the Court erred by excluding Rule 404(b)(2) evidence of Perconti's illicit interstate gambling conduct. Def.'s Mot. at 12. Specifically, Sorensen contends that the Court improperly excluded evidence that Perconti and his father were never charged in those activities, and thereby Perconti received a benefit from the Government in exchange for his testimony, which is relevant to his credibility. *Id.* The Court finds this argument to be without merit.

As the Government points out, and Sorensen acknowledges in his Motion, the Court permitted defense counsel to ask some questions about the benefit to Perconti

for his testimony. Govt. Resp. at 21; Def.'s Mot. at 12. Specifically, the Court permitted, "a succinct question or two . . . on the issue of benefits that were provided, I would be more inclined to allow that, as opposed to this getting into the weeds about [Perconti's] father's business . . . . I don't see how it ties back in after that to Mr. Bernard Perconti." Tr. 905–06. During a sidebar, Goncharova's counsel proposed several questions regarding Perconti's involvement in interstate gambling activity with his father and the fact that neither Perconti nor his father was charged with any crimes arising out of that activity. *Id.* 906. The Court approved all proposed questions. *Id.* Accordingly, Goncharova's counsel asked similar questions during Perconti's cross-examination. *Id.* 995–96 (asking whether Perconti told the Government before trial "about an illegal interstate gambling activity that you were involved with, you, your father, and some others, right?"; "Has your dad, your business partner, has he been charged with any interstate gambling charges, either State or Federal?"; "Part of your benefit is you and your pop don't get charged with State or Federal gambling charges, right?"). Sorensen did not ask Perconti about any interstate gambling activities. *See id.* 936–95. Sorensen's Motion does not specify what additional evidence of Perconti's alleged illegal interstate gambling activities Sorensen believes the Court erroneously excluded. Accordingly, the Court denies Sorensen's motion for a new trial on the basis of the exclusion of Rule 404(b)(2) evidence of Perconti's interstate gambling activities.

### G. O'Neil's Testimony

Sorensen argues that the Court erred in denying his motion for a mistrial when O'Neil testified that a percentage-based contract was illegal. Def.'s Mot. at 12–13. Specifically, Sorensen takes issue with the following testimony:

> Q. What did you think about that at the time?
> A. I was excited about it. I thought it would be highly unusual, but it definitely solved my complexity problem.
> Q. Why did you think it would be unusual?
> A. Getting paid on a percentage in a Federal health care program is illegal.

Tr. 1068. Sorensen immediately objected and moved to strike, and the Court held a sidebar. *Id.* The Court denied Sorensen's oral motion for a mistrial during the sidebar, but sustained the objection and stuck the answer. *Id.* 1068–73. The Court then sustained the objection in open court and struck the answer. *Id.* 1073. Moreover, the Court told the jury, "And I would just use this opportunity to remind you, Ladies and Gentlemen of the Jury, that a lay witness' opinion regarding the legality is not appropriate. The Court is the one that makes the determination as to that point. So to the extent that a lay witness offers that opinion, you are to disregard such an opinion. Okay?" *Id.* The Court asked Sorensen's counsel if there was "anything else," to which counsel responded, "[n]othing else, Your Honor. Thank you." *Id.* In the jury instructions read to the jury at the close of the case, the Court instructed the jury that the jury "must follow all of [the Court's] instructions about the law, even if you disagree with them," and that they must "take the law as [the Court] give[s] it to [them], apply it to the facts, and decide if the government has proved the defendants guilty beyond a reasonable doubt." Jury Instr. at 1.

41

In his motion for a new trial, Sorensen contends that, after hearing O'Neil's testimony about the illegality of being paid on a percentage-based rate, "the jury could no longer hear the evidence impartially." Def.'s Mot. at 13 (citing *Tanner*, 628 F.3d at 898 (7th Cir. 2010) ("As a general matter, a mistrial is appropriate when an event during trial has a real likelihood of preventing a jury from evaluating the evidence fairly and accurately, so that the defendant has been deprived of a fair trial.") (cleaned up)). The Court disagrees. As stated above, "jurors are presumed to follow limiting and curative instructions unless the matter improperly before them is so powerfully incriminating that they cannot reasonably be expected to put it out of their minds." *Danford*, 435 F.3d at 687 (cleaned up). As the Government correctly points out, in the other case cited by Sorensen, the Seventh Circuit held that a mistrial was not required even in the face of a constitutional violation, where the prosecutor commented in closing argument about the defendant's choice not to testify. Govt. Resp. at 23 (citing *Tanner*, 628 F.3d at 898). Where, as here, the Court immediately struck the testimony, instructed the jury not to consider it, gave a limiting instruction to the jury regarding the law they must apply, and again told them before deliberations that they must apply the law as given by the Court, the Court finds that O'Neil's comment was not so prejudicial that it prevented the "jury from evaluating the evidence fairly and accurately." *Tanner*, 628 F.3d at 898. Indeed, as the Government points out, the verdict acquitting Goncharova demonstrates that the jury followed the Court's instructions. Govt. Resp. at 23 (citing *United States v. Neal*, 27 F.3d 1035, 1045 (5th Cir. 1994) ) ("[T]he jury's 'not guilty' verdicts as to some

defendants [can] demonstrate[] that the jurors followed the district court's instructions and considered the evidence separately as to each defendant.")); *see also United States v. Magana*, 118 F.3d 1173, 1189 (7th Cir. 1997) ("It is evident that the jury was careful in its consideration of the evidence with respect to the individual counts and Defendants, since, while finding Defendants guilty of a number of counts in the indictment, it also found a number of Defendants not guilty on various charges."). The Court finds that O'Neil's testimony is not a basis for a new trial.

### H. Other Objections

Finally, Sorensen generally asserts that the Court "erred in denying Mr. Sorensen's oral motions and objections prior to and during the trial, as well as sustaining the government's objections prior to and during trial," as well as the written and oral motions made by Goncharova in which Sorensen joined. Def.'s Mot. at 13. With no specific arguments before the Court as to why its rulings, apart from the seven addressed above, were incorrect, the Court finds that Sorensen has not sufficiently raised a basis for granting a new trial. *See, e.g.*, *United States v. Huddleston*, 2008 WL 818336, at *1 (C.D. Ill. Mar. 21, 2008) (denying motion for new trial where defendant, in addition to raising several specific issues, also "generally ask[ed] the Court . . . to reverse all of the rulings denying any and all of [d]efendant's motions and objections," finding that the court's rulings on defendant's "motions and

objections were correct at the time they were made for the reasons stated of record or for the reasons stated in written decisions").

## Conclusion

For the reasons given above, the Court denies Sorensen's motions for judgment of acquittal and for a new trial [196], [200].

Dated: July 31, 2023

United States District Judge
Franklin U. Valderrama